**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 91-7396

UNITED STATES of AMERICA,

Plaintiff-Appellee,

VERSUS

GARRETT A. TANSLEY, a/k/a JERRY TANSLEY and
DOUGLAS RAYMOND COX, a/k/a DOUG KELLY,

Defendants-Appellants.

Appeals from the United States District Court
For the Northern District of Texas
(March 11, 1993)

Before REYNALDO G. GARZA, HIGGINGBOTHOM and DeMOSS, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Appellant Cox appeals (i) the amount of funds used to calculate his offense level in sentencing; and appellant Tansley appeals: (ii) the sufficiency of the evidence supporting his conviction; (iii) the inclusion of a lottery statute violation as one of the conspiracy's elements; (iv) the limitations placed upon his defense cross-examinations; (v) the inadmissibility of several letters into evidence; and (vi) and the court's finding that his role was that of a manager or supervisor for sentencing purposes. Upon review we find that these arguments are without merit and we

therefore affirm.

This case involves a telemarketing scheme operated from November 1, 1989 through July 31, 1990, involving 18 defendants and over 3500 victims nationwide. Appellant, Douglas Cox, started the boiler room operation and became its president. It was called the National Awards Center (NAC) and was based in Arlington, Texas. Appellant, Garrett Tansley, as a representative of a Florida mailout center, Marketing Response Group (MRG), caused numbered postcards to be mailed throughout the United States guaranteeing that the recipient had won at least one of "Top 5 Fabulous Premiums," each having stated retail values ranging from $500 to $25,000. If the recipient called the number inquiring about their prizes, he would be subjected to a high-pressure phone sale by a scripted salesperson. The callers would be asked to purchase a water filter worth about $45 for $429 and told that they would then be eligible for two prizes. The phone seller would request the caller's credit card number and would reassure the buyer that the potential awards included a $25,000 car, a $5,000 cashier's check, $5,000 in retail merchandise checks, men's and ladies' diamond watches valued at $500 and a $1,000 U.S. Savings Bond. In reality the only gifts ever sent were the merchandise checks worth from $0 to $7 and the watches worth between $15 and $30 each. The misrepresentations in the sales pitch included statements that the

2

Environmental Protection Agency (EPA) would require all homes to have the filter within a year, that the chlorine in water caused cancer, hardening of the arteries and other diseases and that the filter would also remove all algae, rust, bad tasting odors and radon gas from the water. There was testimony that in reality, the tap water had no threat of chlorine poisoning and that other various alleged harms were fabricated.

If a person would not purchase a filter he would then be asked to send in $12.95 to obtain his or her prize, invariably the worthless merchandise checks. The callers were also told that only two percent received white postcards and that very few also had the high number of 5000 on them and this meant that they had a very high probability of winning. In reality all of the cards were white and had the number 5000 printed on them and were identical in all respects. NAC then had to find various companies to launder the various credit card purchases because most banks would not handle telemarketing transactions. The middlemen entities would send the purchases though their own merchant accounts in order to launder the credit card monies. These processors are called factors and included the United Financial Group, Inc. having a merchant account with Malibu Savings Bank, Costa Mesa, California; American Data Base Corporation having a merchant account at Huntington National Bank, Shaker Heights, Ohio; and S & G Enterprises having a merchant account at Vermont National Bank, Rutland, Vermont.

There was substantial testimony supporting the convictions of

3

Cox and Tansley.  Both men were convicted of conspiracy in count one of the indictment delineating the objects of the agreement as 1) mail fraud, in violation of 18 U.S.C § 1341; 2) wire fraud, in violation of 18 U.S.C. § 1343; 3) bank fraud, in violation of 18 U.S.C. § 1344; 4) the engagement of an unlawful lottery, in violation of 18 U.S.C. § 1302; and 5) the laundering of monetary instruments, in violation of 18 U.S.C. § 1956(a) (1) and (A) (i). Tansley was charged with wire fraud in count 2, but he was found not guilty of sending a fax interstate to Cox detailing the operation.  The indictment went on to charge Cox with a total of 15 counts.

Cox was sentenced to imprisonment for 121 months each on count 1 for conspiracy, and counts 3 through 9 and 27 for wire fraud.  He was further sentenced to 60 months each on counts 28 and 29 for bank fraud and counts 30 through 33 for money laundering.  All sentences are to run concurrently.  He was further sentenced to a three year term of supervised release and ordered to pay $5,577 restitution and a $750 special assessment.  Tansley was sentenced on count 1 to 55 months imprisonment, to a three year supervised release, ordered to pay $5,577 restitution and a $50 special assessment.

## ANALYSIS

I.  Amount Used to Determine Cox's Offense Level

The fact that NAC was only able to siphon off a partial amount

4

before the accounts were frozen does not change the conspiratorial objective of laundering the entire operation's cash. The district court's finding under the United States Sentencing Guideline § 2S1.1(b)[1] on the value of funds involved in a money laundering offense is reviewed for clear error. See United States v. Richardson, 925 F.2d 112, 116 (5th Cir.), cert. denied, 111 S. Ct. 2868 (1991). Cox argues that only the amount that left the account, $175,722, should be considered laundered, not the $1,537,000 that was deposited at the various banks.[2] We find that the larger amount that was processed through the various factors and then deposited in various banks were put in the laundering process and the fact that all the money was not withdrawn is irrelevant. We take into consideration all "[s]pecific offense characteristics . . . all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable . . . ." U.S.S.G. § 1B1.3, comment n.1; See

---

[1] § 2S1.1 provides in relevant part:
(2) If the value of the funds exceeded $100,000, increase the offense level as follows:

| Value (Apply the Greatest) | Increase in Level |
|---|---|
| (A)  $100,000 or less | no increase |
| (B)  More than $100,000 | add 1 |
| (C)  More than $200,000 | add 2 |
| (D)  More than $350,000 | add 3 |
| (E)  More than $600,000 | add 4 |
| (F)  More than $1,000,000 | add 5 |

[2] The total amount that was entered into the laundering process, $1,537,000, was correctly used in the sentence calculation as opposed to the lesser amount, $175,722 actually withdrawn, enhanced Cox's guideline four offense levels, from one to five. His sentence guideline increased from the range of 78 to 97 months to the range of 121 to 151 months. We note that appellant was sentenced to the minimum, 121 months.

also <u>Richardson</u>, 925 F.2d at 115 n.7.  The intention of laundering the entire amount is enough for sentencing purposes.  <u>Id</u>. at 116.  Funds under negotiation in a laundering transaction are properly considered in the calculation of a sentence.  <u>Id.</u> at 116 n.12.

The court may also use the broader amount that defendants could have been "reasonably capable" of laundering.  <u>United States v. Fuller</u>, 974 F.2d 1474, 1484 (5th Cir. 1992).  Cox clearly intended to launder all of the monies involved in the conspiracy and was also reasonably capable of accomplishing this.  Appellant cites <u>United States v. Johnson</u>, 971 F.2d 562 (10th Cir. 1992), to support his argument that only funds that actually come out of the "washing process" should be used in the sentence calculation.  This case can be distinguished because in it there was only intent to launder half of the money while in the instant case all of the solicited funds were directed to factors for deposit in their respective merchant accounts.  It is not how much is taken out but how much is intended to be put in the process.  The intent to cleanse the entire amount for further distribution is sufficient and the court's finding was proper.  We "will uphold the district court's sentence so long as it results from a correct application of the guidelines to factual findings which are not clearly erroneous."  <u>United States v. Sarasti</u>, 869 F.2d 805, 806 (5th Cir. 1989).

II.  <u>Sufficiency of Evidence to Convict Tansley of Conspiracy</u>

The standard used for sufficiency of evidence is whether any

juror could reasonably find the evidence established guilt beyond a reasonable doubt.  United States v. Martinez, 975 F.2d 159, 161 (5th Cir. 1992).  This court reviews the evidence, both direct and circumstantial, and all its inferences, in the light most favorable to the verdict.  United States v. Osum, 943 F.2d 1394, 1404 (5th Cir. 1991).  To prove conspiracy the government is required to prove beyond a reasonable doubt that two or more persons agreed to commit a crime and that at least one of them committed an overt act in furtherance of that agreement.  United States v. Duncan, 919 F.2d 981, 991 (5th Cir. 1990), cert. denied, 111 S.Ct. 2036 (1991).  There is ample evidence of the agreement to commit the scheme, that Tansley himself was a manager in that scheme and that he personally committed acts in its implementation.  The evidence was clearly sufficient to support Tansley's conviction of conspiracy.  There was testimony that he presented various design and wording samples to Cox and NAC and caused the cards to be actually mailed out.  There was also evidence that Tansley offered advice on which states to mail to so as to avoid heightened scrutiny.  The appellant knew of the inflated value of the prizes actually sent and that the alleged prizes never were actually won by anyone.  He personally had the cards modified to increase the closing rate of the scam's victims.

Tansley took care of virtually all the logistics of the conspiracy except for the phone sell.  Several witnesses testified that Tansley suggested and introduced various factors to the telemarketers.  In short, there was strong evidence that Tansley

was not only involved in the conspiracy from the beginning but that he also was a manager of the mailings and instrumental in instituting the credit card slip laundering. The weight and credibility of the evidence is solely decided by the jury. United States v. Pena, 949 F.2d 751, 756 (5th Cir. 1991). "An appellate court will not supplant the jury's determination of credibility with that of its own." Martinez, 975 F.2d at 161. The government clearly proved its charge of conspiracy against the appellant.

III. The Lottery Statute

The lottery statute, 18 U.S.C. § 1302,[3] is not

---

[3] Mailing lottery tickets or related matter
Whoever knowingly deposits in the mail, or sends or delivers by mail:

Any letter, package, postal card, or circular concerning any lottery, gift enterprise or similar scheme offering prizes dependent in whole or in part upon lot or chance;
Any lottery ticket or part thereof, or paper certificate, or instrument purporting to be or to represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, gift enterprise, or similar scheme offering prizes dependent in whole or in part upon lot or chance;
Any check, draft, bill, money, postal note, or money order, for the purchase of any ticket or part thereof, or of any share or chance in any such lottery, gift enterprise, or scheme;
Any newspaper, circular, pamphlet, or publication of any kind containing any advertisement of any lottery, gift enterprise, or scheme of any kind offering prizes dependent in whole or in part upon lot or chance, or containing any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes;
Any article described in section 1953 of this title-
Shall be fined not more than $1,000 or imprisoned not more than two years, or both; and for any subsequent offense shall be imprisoned not more than five years.
Id.

unconstitutionally vague and the jury charge was proper. The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness so that an ordinary person may understand what conduct is actually prohibited. See Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed. 903 (1983). Only a reasonable degree of certainty is required. See United States v. Barnett, 587 F.2d 252, 256 (5th Cir.), cert. denied, 441 U.S. 923 (1979). The requirement that statutes give fair notice cannot be used as a shield by someone who is already intent on wrongdoing. See United States v. Brewer, 835 F.2d 550, 553 (5th Cir. 1987). The Supreme Court stated:

> In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications.

Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494-95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982) (footnotes omitted). There are no First Amendment arguments of overbreadth by Tansley; rather he contends that the statute was vague in its application to him. Upon examination, the statute was designed specifically to prohibit Tansley's conduct. The term "lottery" has been defined as a "scheme for the distribution of prizes or things of value by lot or chance among persons who have paid or agreed to pay a valuable consideration for the chance to obtain a prize."

9

<u>Peek v. United States</u>, 61 F.2d 973, 974 (5th Cir. 1932). The evidence shows that the "prizes" were not mailed unless the $12.95 was paid. This consideration was requested in order for the victims to be actually awarded their prizes and therefore the scheme constituted a lottery. The Supreme Court further stated in <u>Hoffman</u>:

> [V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand. . . . One to whose conduct a statute clearly applies may not successfully challenge it for vagueness. . . . The rationale is evident: to sustain such a challenge, the complainant must prove that the enactment is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensive normative standard, but rather in the sense that no standard of conduct is specified at all.. . .

<u>Hoffman</u>, 455 U.S. at 495 n.7 (citations omitted). A very definitive standard of conduct, conduct Tansley specifically performed, is proscribed by the statute.

The jury charge also set out the various elements correctly. "First, whoever knowingly deposits in the mail or sends or delivers by mail; second, any letter, postcard, or circular; third, which concerns the offering of a prize; fourth, upon the furnishing of consideration; and fifth, that the distribution of the prize was by chance." R. I, 480. The evidence supports all of these elements. Tansley did in fact conduct a lottery and the statute's application to the facts is definitive.

IV. <u>Cross-Examination Limitations</u>

10

Tansley argues that the court's limiting of his cross-examinations denied him his 6th Amendment rights to a fair trial. The points of limitation that Tansley now appeals were restricted either because of repetitive or argumentative questioning and the defense failed to preserve many of them by objection and offer. A claim of error in excluding evidence must show that a substantial right is affected and the substance was apparent or made known to the court by offer. Fed. R. Evid. 103(a)(2); United States v. Harrelson, 754 F.2d 1153, 1179 (5th Cir.), cert. denied, 474 U.S. 908 (1985). The Supreme Court has recognized that trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examinations based on among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435, 89 L.Ed 2d 674 (1986). The relevant inquiry is whether the jury had sufficient information to appraise the bias and motives of the witness. Smith v. Collins, 964 F.2d 483, 486 (5th Cir. 1992). The record shows that the witnesses' potential biases and motives were adequately addressed by the defense. The limitations by the court were made after the questioning became redundant and argumentative and most times only peripherally relevant. Tansley's rights were not infringed upon nor was he deprived of a fair trial.

V. Inadmissibility of Letters

11

Tansley again argues that his right to a fair trial was denied because he was not allowed to submit into evidence three letters.[4] The admissibility of evidence is a matter within the discretion of the trial court. See United States v. Abroms, 947 F.2d 1241, 1249 (5th Cir. 1991), cert. denied, 112 S.Ct. 2992 (1992). The letters talked about the payment of awards. The purpose of their submission was viewed solely to bolster the defense's arguments. Since they were to be admitted to assert their truth, they failed to pass the hearsay test and were properly excluded. See United States v. Mastropieri, 685 F.2d 776, 793 (2d Cir.), cert. denied, 459 U.S. 945 (1982). A trial court's ruling of admissibility will not be disturbed unless there was an abuse of discretion creating the likelihood of prejudice to a defendant. United States v. Stout, 667 F.2d 1347, 1353 (11th Cir. 1982); United States v. Nill, 518 F.2d 793 (5th Cir. 1975). The letters also were only partially relevant and even if allowed were not potentially exculpatory. There was no error here.

VI. Tansley's Supervisory Role

The appellant challenges his three level offense increase in sentencing based on his role as a manager or supervisor of the conspiracy under U.S.S.G. § 3B1.1(b).[5] At first the district court

_____

[4] The three letters were all signed by Peter Porcelli, President and CEO of MRG.

[5] U.S.S.G. § 3B1.1(b) states:
(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by

agreed that the appellant did not exercise a leadership role. The government then correctly convinced the court of Tansley's lesser role as a manager in the scheme. This conspiracy had many participants, and certainly meets the statutory five participants or otherwise extensive requirement set by the guideline. The finding by the courts that a defendant had significant management responsibilities and therefore warranted the three level increase has consistently been upheld. United States v. Pierce, 893 F.2d 669, 676 (5th Cir. 1990), cert. denied, 113 S.Ct. 621 (1992). The fact that Tansley brought in other coconspirators, including mailers and factors in furtherance of the scheme, underscores his supervisory role. United States v. Liu, 960 F.2d 449, 456 (5th Cir.), cert. denied, 113 S.Ct. 418 (1992). Tansley had advised Galindo and Cox on how and where to mail the postcards. He personally introduced and modified the design of the cards and had them mailed throughout the country. Tansley advised the coconspirators on which states to avoid mailing to so as to escape heightened scrutiny. Tansley also advised about the need for factors and helped arrange their introduction and use. He was instrumental in creating, designing and carrying out the telemarketing mailing for the conspiracy throughout. His special wording and subsequent modifications were designed to increase the number of victims throughout the nation by fraudulently arousing the interests of recipients who were in turn bombarded with a sales pitch for money, either $429 or $12.95.

---

three levels.

13

The standard of review for a factual finding of the district court is that of clear error. <u>See United States v. Alfaro</u>, 919 F.2d 962, 966 (5th Cir. 1990). We will uphold the court's sentence as long as the guidelines are correctly applied to findings that are not clearly wrong. <u>United States v. Kinder</u>, 980 F.2d 961, 963 (5th Cir. 1992). Tansley helped plan, design and advise this scheme from the beginning. His introduction of the factors was instrumental and necessary for the conspiracy to succeed. Tansley handled almost all of the part of the scheme that lead up to the sales pitch and was instrumental in the subsequent laundering of the proceeds. The court's finding is reasonable and there is also no error here.

<u>CONCLUSION</u>

The calculations of both Cox's and Tansley's sentences were in accordance to the guidelines. The evidence in support of Tansley's conspiracy conviction is strong. The scheme was in clear violation of the lottery statute. The limitations of the defense cross-examinations were not erroneous and the court's refusal to admit the three letters into evidence for hearsay reasons was proper. For the above reasons Cox's sentence and Tansley's conviction and sentence are

AFFIRMED.

14